UNITED STATES DISTRICT COURT
FOR THE EASTEN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CONLAN TIRE CO., LLC,

      Plaintiff,               Case No._____

v.                              Hon. _____

ALEC "A.J." GONZALES,        Magistrate Judge _____

      Defendant.

_____

## **Verified Complaint**

Plaintiff Conlan Tire Co., LLC, for its Complaint against Defendant Alec "A.J." Gonzales, states as follows:

1.      This action arises out of Defendant's breach of the Confidentiality and Non-Solicitation Agreement he entered into with Conlan, during his tenure as a sales representative for the company in the Dallas/Fort Worth area. **Attached as Exhibit 1**.

2.      Under his Agreement, Defendant agreed to three restrictions both during and after his employment with Conlan: (1) he would not use or disclose any confidential information, (2) for 24 months, he would not solicit business from, accept business from, or otherwise interfere with Conlan's customers—limited narrowly to only those customers with whom he had direct contact, and (3) for 24 months, he would not solicit employment from, hire, or offer employment to any Conlan employee. Importantly, the Agreement did permit Defendant to work in the industry and for Conlan's competitors—he was simply required to avoid contact with his former customers for

the specified period. Despite these narrow, enforceable, and clear restrictions, Defendant immediately and systematically breached all three obligations upon his separation from Conlan, flagrantly violating each substantive provision of the Agreement he had signed.

3.     After being terminated from his employment with Conlan, Defendant immediately accepted employment with one of Conlan's largest competitors, Snider Fleet Solutions, operating as a competing sales representative for Snider, in the same geographic region in which he had previously operated for Conlan. Immediately after joining Snider, Defendant began soliciting Conlan customers with whom he had previous relationships, soliciting Conlan employees who he knew were favored by Conlan customers to join him at Snider, and using Conlan's confidential information to try and convert Conlan's business to his new employer Snider.

4.     Each of these acts has imposed, and will continue to impose, irreparable harm to Conlan's goodwill and relationships with its customer base. Thus, Conlan seeks a temporary restraining order, preliminary and permanent injunctive relief, money damages, and attorneys' fees and costs, along with any further relief the Court deems necessary.

### Jurisdiction and Parties

5.     Conlan is a Michigan limited liability corporation, with its principal place of business located in Warren, Michigan, and a registered agent located in Warren, Michigan. Conlan, which merged with Great Lakes and Treading Co, LLC, in 2018, is

a seller and servicer of commercial tires and related products, as well as a manufacturer of retreaded commercial truck tires, with numerous offices in Michigan, Ohio, Illinois, Missouri, Arkansas, Texas, and Florida. Conlan's sole member is Sidewall Holdings, LLC. Sidewall Holdings is a Michigan limited liability company, with its headquarters in Michigan. Sidewall Holdings has two members: (1) 2020 AAM Trust, a Michigan trust with Michigan citizen Matthew T. Moroun as the sole trustee, and (2) Alex Conlan, a citizen of Florida. Thus, all members of Conlan are citizens of Michigan and Florida.

6.     Upon information Defendant provided to Conlan during his employment, Defendant resides in Dallas, Texas. Defendant was previously employed by Conlan as an Account Executive, working out of Plaintiff's offices in Dallas and Fort Worth, Texas from July 18, 2022, until his termination on December 30, 2024.

7.     This Court has subject matter jurisdiction in this case under 28 U.S.C. § 1332, because Defendant is a citizen of a different state (Texas) than Conlan (Michigan and Florida) and the amount in controversy exceeds $75,000.00.

8.     This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391(b), and the parties' Agreement.

**General Allegations**

**A.     Conlan's business practices**

9.     Conlan operates in numerous States across the country "Retreading America"—i.e., providing exceptional commercial tire services, including tire sales, tire retreading, and tire-repair servicing for commercial trucks all across the United States.

- 3 -

Conlan's business model is based upon deep and committed customer relationships, ensuring that they always put quality and customer satisfaction above profits.

10.     Account Executives at Conlan occupy a largely public facing sales role, tasked with developing and maintaining relationships with customers who need to purchase and repair commercial grade truck tires. To that end, Account Executives are required to make initial calls to trucking companies, identify purchasing decisionmakers/fleet managers and the like, understand the customer's needs, negotiate on pricing, and build and maintain longstanding relationships with these decisionmakers.

11.     In order to build these relationships and develop good will, Conlan provides Account Executives an expense account to pay for lunches and gifts for customers. It is not uncommon for an Account Executive to learn a customer's favorite drink or hobbies, and, for example, to act on that information by bringing a bottle of whiskey to the customer's offices or taking the fleet manager for their favorite lunch.

12.     Although Conlan would occasionally provide its Account Executives with sales leads, Conlan primarily compensates its Account Executives, while also providing commissions and covering expenses, to go out and land additional customers and accounts for Conlan.

**B.      Defendant's employment with Conlan and the parties' Confidentiality and Non-Solicitation Agreement**

13.     Defendant began working for Conlan on July 18, 2022, and was employed as an Account Executive in the Dallas and Fort Worth, Texas area.

14.     As a result of his employment, Defendant had access to Conlan's confidential information, good will, and crucially important business and customer relationships.

15.     Conlan provided Defendant access to, and Defendant helped develop for Conlan, proprietary and competitively sensitive business information including (but not limited to) information regarding the particular needs of Conlan's customers, each customer's unique preferences, customer purchasing history, the terms of customers' business relationships with Conlan, pricing strategies, marketing plans and strategies, the identity of and plans for specifically targeted prospective customers, and certain non-public financial records.

16.     Defendant, as part of his employment with Conlan, was also privy to certain Conlan confidential and trade secret information, including customer lists, extensive customer information, pricing information, business plans and profits, profit margins, and product information.

17.     Consistent with his job description, Defendant was paid by Conlan to develop several close relationships with owners and purchasing leaders of customers in the Dallas/Fort Worth area.

18.    In order to protect their competitively sensitive and proprietary information, good will, customer relationships, and other protectable interests in this highly competitive industry, it is common practice for employers to utilize restrictive covenants. Conlan requires its Account Executives, including Defendant, to sign a relatively narrow and pointed Confidentiality and Non-Solicitation Agreement, to protect its highly valuable confidential information and customer relationships. *See* Ex. 1.

19.    Defendant's Agreement, which explicitly notes that Defendant entered into it "[i]n consideration of [his] employment . . . by the Company, the Company providing [him] with access to Confidential Information, and for other good and valuable consideration," Ex. 1, p. 1, has several provisions relevant here.

20.    *First*, Defendant agreed to keep all of Conlan's nonpublic, proprietary information confidential.  Ex. 1, § 2.

21.    In particular, Defendant agreed that all confidential information—defined as including all nonpublic "information that concerns the business affairs of the Company or its customers, clients, or accounts, including but not limited to: customer and customer prospects lists, call lists and all other customer data; product and service pricing; . . . and logistics in the way of routing, rating and pricing"—"is and shall remain the exclusive property of" Conlan.  Ex. 1, § 2.A.

22.     This Confidentiality Provisions also prohibits Defendant from "us[ing]" confidential information "for the direct or indirect benefit of, any person or entity other than" Conlan.  Ex. 1, § 2.C.

23.     *Second*, Defendant agreed to a narrow non-solicitation clause that prevented him, for 24 months after leaving Conlan's employ, from soliciting or accepting business from Conlan's clients that he had an ongoing, direct relationship with.

24.     More specifically, Defendant agreed "that, during his/her employment, and for a period of twenty-four (24) months after his/her employment has terminated, for any reason, he/she will not, either solely or jointly with, or as manager or agent for, any person, corporation, trust, joint venture, partnership, or other business entity, directly or indirectly, approach or solicit for business, accept business from, divert business from, or otherwise interfere with any Company relationship with, any person or entity (or legal successor to such person or entity) that Employee had any direct contact with while employed by the Company and that: (a) has been a customer of the Company at anytime within the six (6) month period prior to Employee's termination; or (b) to whom the Company had made a proposal within the six (6) month period prior to Employee's termination."  Ex. 1, § 3.

25.     *Third*, Defendant also agreed not to solicit any personnel of Conlan during his employment and for 24 months after leaving Conlan's employ.

26. To wit, Defendant agreed "that, during his/her employment, and for a period of twenty-four (24) months after his/her employment has terminated, for any reason, Employee will not, directly or indirectly, solicit for employment, hire, or offer employment to, or otherwise aid or assist any person or entity other than the Company, in soliciting for employment, hiring, or offering employment to: (a) any employee of the Company or any independent contractor engaged by the Company; or (b) any former employee or independent contractor of the Company who was employed, or engaged, by the Company within six (6) months before or after the cessation of Employee's employment." Ex. 1, § 4.

27. Defendant also acknowledged that "any breach of this Agreement is likely to result in irreparable injury to the Company, and agrees that the Company shall be entitled, if it so elects, to institute and prosecute proceedings in any court of competent jurisdiction, either in law or in equity, to obtain damages for any breach of this Agreement, to enforce the specific performance by [Defendant] of this Agreement, and/or to enjoin [Defendant] from activities in violation of this Agreement," with jurisdiction proper in Macomb County Circuit Court or the U.S. District Court for the Eastern District of Michigan, and all disputes are to be governed by Michigan law. Ex. 1, § 7.A–C.

28. The Agreement also noted that if Defendant did not "fully compl[y] with" the customer and personnel non-solicitation provision in §§ 3 and 4 of the Agreement, Conlan reserved the right to have "the period of the restriction(s) . . . be extended to

commence with the full compliance by [Defendant], and to run fully thereafter, reduced only by the length of time between the cessation of [Defendant]'s employment and his/her first violation of Section 3 or 4."  Ex. 1, § 7.E.

29.    Defendant signed this Agreement on July 13, 2022, five days before commencing his role as Account Executive with Conlan.  Ex. 1, p. 3.

30.    The parties' Agreement and the incorporated non-compete and non-solicit provisions within are fully compliant with Michigan law, MCL 455.774a, and the confidentiality provision is similarly lawful and consistent with Michigan public policy, as these narrowly drawn provisions are all related to Conlan's legitimate and competitive business interests, and reasonable as to duration, geographic area, and scope.

**C.    Defendant's brazen solicitations of Conlan customers and employees, and improper use of confidential information**

31.    On December 30, 2024, Conlan terminated Defendant's employment following Defendant's receipt of a criminal citation for unlawfully driving under the influence in a company vehicle.

32.    The following day, On December 31, 2024, the remainder of the sales team in the Fort Worth area attended a meeting when Conlan informed them of Defendant's termination from employment. At the meeting, Conlan instructed the remaining Account Executives to quickly begin meeting face-to-face with all of Conlan's customers for whom Defendant served as Account Executive, in order to maintain those relationships and, hopefully, retain all prior business.

33.     Shortly thereafter, Defendant accepted a job in sales for Snider Fleet Solutions, one of Conlan's main competitors.

34.     Almost immediately, he began systematically and intentionally breaching the Confidentiality and Non-Solicitation Agreement.

35.     Indeed, Conlan has direct evidence that Defendant improperly used its confidential information, solicited and unfairly converted customers, attempted to solicit and unfairly convert other customers, and successfully solicited at least two Conlan employees to join him at Snider Fleet Solutions.

36.     For example, based upon Conlan's first-hand knowledge, Defendant successfully solicited and convinced the following customers—all of whom Conlan paid Defendant to develop and service for Conlan's business—to convert all or part of their business to Snider:

      a.   Freedom Trans Dedicated;

      b.   QW Transport;

      c.   Big D Concrete;

      d.   Redbull McKinney;

      e.   GTO Transportation;

      f.   England Products;

      g.   Superior Pipeline Yard; and

      h.   Taxco.

37.     In addition, Defendant solicited, albeit unsuccessfully, numerous other customers of Conlan for which he was paid to develop and service for Conlan's business, and many of whom informed Conlan representatives of Defendant's unlawful attempts to take their business to Snider:

     a.  10 Services;

     b.  Quirch Foods;

     c.  TA Services;

     d.  American Materials;

     e.  Matheson Tri Gas;

     f.  NG Concrete;

     g.  3G Express;

     h.  Metropolitan Gunnite;

     i.  Carvana; and

     j.  Cowtown Materials.

38.     As a result of Defendant's unlawful actions, Conlan has suffered, and will continue to suffer, significant losses of revenue.

39.     Although showing a direct relationship between Defendant's unlawful actions and Conlan's damages is inherently difficult in this context, there is already circumstantial evidence that Defendant's solicitation of Conlan's customers has caused significant and growing damages. Comparing revenues from Conlan customers in the

Dallas/Fort Worth area for whom Conlan paid Defendant to develop and service shows substantial decrease in Conlan's revenues.

40.     These harms will continue to grow if Defendant is permitted to continue his unlawful course of conduct. After all, Conlan paid Defendant to manage and service accounts that brought in over $1,000,000 in annual revenue to Conlan.

41.     Beyond Defendant misappropriating customers, he has also begun poaching Conlan's employees whom he knew only through his prior employment with Conlan.

42.     Jose Vigil was an Technician with Conlan from October 16, 2024, until January 30, 2025.

43.     A Conlan Account Executive ran into Mr. Vigil at another Conlan customer sometime in January. Mr. Vigil specifically told Mr. Hasenak that he went to Snider because Defendant convinced him to do so.

44.     Additionally, an Off the Road Mobile Technician who specialized in heavy-duty equipment named Andy Marmelejo also followed Defendant to Snider, after Defendant's urging.

45.     As Defendant was well aware from his work for Conlan, technicians like Mr. Vigil and Mr. Marmelejo are specially trained, well compensated for their expertise, and an important part of sales pitches to obtain and retain customers.

46.     Defendant targeted Mr. Vigil and Mr. Marmelejo for the express purpose of meeting Conlan customer preferences and having a better chance of unfairly flipping

those customers to Snider—again utilizing unique, competitively sensitive knowledge about customers he knew only by virtue of his employment at Conlan.

47. Thus, Defendant's previous and ongoing poaching of Conlan's highly skilled employees also results in significant harm and damages to Conlan.

48. Defendant's current employer, Snider, agrees with Conlan regarding the importance of protecting its customer relationships, good will, and competitively sensitive proprietary information.

49. Snider requires its sales employees to sign even broader restrictive covenant agreements that require its former sales employees to completely sit out of the industry in a geographic area for a time following their separation from Snider.

50. Snider also has a pattern and practice of filing lawsuits against former sales employees to enforce a full non-compete clause. In a previous lawsuit challenging the employment of a former sales colleague of Defendant, Snider explicitly admitted that it needed to protect "its proprietary business information including (but not limited to) information regarding the particular needs of Snider's customers, customer purchasing history, the terms of customers' business relationships with Snider, pricing strategies, Snider's marketing plans and strategies, the identity of and plans for specifically targeted prospective customers, and Snider's non-public financial records"—i.e., the same protectable interests that Conlan seeks to protect in this lawsuit.

51. Snider also admitted in that lawsuit that a former sales employee's breach of a non-compete agreement and confidentiality agreement "have caused and threaten

to continue to cause harm to Snider by way of loss of customers, loss [of] profits, loss of confidential information, and loss of goodwill."

52.     Again, Snider sees these risks as such a significant threat to their business, that they actually impose a complete non-compete on their employees—unlike the significantly more limited non-solicitation provisions in the parties' Agreement— prohibiting them from working for any individual or business that competes with Snider for a whole year following the end of their employment.

53.     As with the harm caused to Snider, Defendant's breaches of the Agreement's non-solicit and confidentiality clauses cause Conlan grave, irreparable harms.

54.     In addition, Conlan has incurred substantial and growing attorney fees and costs due to Defendant's numerous breaches of the Agreement, which it is entitled to collect under the Agreement.

**D.     Procedural background**

55.     On January 29, 2025, after becoming initially aware of Defendant's flagrant breaches of the parties' Agreement, counsel for Conlan sent Defendant a cease-and-desist letter.

56.     This letter reiterated to Defendant his obligations under the parties' Agreement, specifically noting that the Agreement prohibited Defendant "from soliciting Conlan's current employees or customers for a period of 24 months after your employment with Conlan ends," while also noting that Defendant "giving [his] current

employer information that it can use to solicit current Conlan employees or customers" would constitute "a breach of contract as well."

57.    Counsel for Snider, but not Defendant, responded in a letter dated February 18, 2025. But this responsive letter merely requested a copy of the parties' Agreement (despite the fact that Defendant was required to provide Snider a copy of the Agreement per its terms, Ex. 1, § 6), and did not acknowledge Defendant's obvious violations of the Agreement.

58.    Thereafter, Defendant failed to comply with Conlan's demands, forcing Conlan to proceed with this lawsuit in order to enforce its rights and obtain the benefit of the bargain the parties agreed to in the Agreement.

## COUNT I – BREACH OF PRESERVATION OF CONFIDENTIAL INFORMATION PROVISION OF CONFIDENTIALITY AND NON-SOLICITATION AGREEMENT

59.    Conlan restates the allegations in all prior paragraphs as if fully set forth herein.

60.    The parties' Agreement is a valid and binding contract supported by valuable consideration.

61.    Defendant's actions are in direct violation of the Agreement.

62.    By signing the Agreement, Defendant expressly agreed not to "directly or indirectly, disclose, communicate, or divulge [Confidential Information] to, or use the same for the direct or indirect benefit of, any person or entity other than [Conlan]. Employee further agrees to take all reasonable precautions to protect from loss or

disclosure all Confidential Information supplied to him/her by [Conlan] or its customers, clients, or accounts." Ex. 1, § 2.C.

63.    Furthermore, the Agreement defines "Confidential Information" as including, among other things, "any and all information that concerns the business affairs of the Company or its customers, clients, or accounts, including but not limited to: customer and customer prospects lists, call lists and all other customer data," as well as "logistics in the way of routing, rating and pricing." Ex. 1, § 2.A.

64.    This confidentiality provision is enforceable because Michigan law and public policy do not prohibit such confidentiality requirements between employers and employees, and so an employer can bind an employee by promise not to use, disclose, or otherwise disseminate confidential information without the employer's permission.

65.    In violation of this non-disclosure provision, Defendant solicited numerous of Conlan's customers on behalf of his new employer, Snider, without first obtaining the written consent of Conlan to use its "customer and customer prospects lists" list or its "pricing" information. Ex. 1, § 2.A.

66.    The information that Defendant accessed while employed by Snider is confidential and of great economic value to Conlan's competitors, including Snider.

67.    Furthermore, Defendant's unlawful use of that confidential information directly supported Defendant's other breaches of the Agreement, resulting in significant lost revenue and business relationships.

68.     As a direct and proximate result of Defendant's violations of the Agreement, Conlan has suffered and will continue to suffer damages in the form of lost business and lost profits and will incur costs and attorney fees in prosecuting this action, which together will exceed $75,000.00.

69.     And, as a direct and proximate result of Defendant's violations of the Agreement, Conlan is suffering irreparable injury, including the loss of the goodwill of its customers, a weakened ability to fairly compete with its competitors, and disclosure of confidential information that Conlan has obtained and/or generated at great expense.

## COUNT II – BREACH OF COVENANT NOT TO SOLICIT CLIENTS, CUSTOMERS, OR ACCOUNTS WITH WHOM EMPLOYEE HAD DIRECT CONTACT, WITHIN CONFIDENTIALITY AND NON-SOLICATION AGREEMENT

70.     Conlan restates the allegations in all prior paragraphs as if fully set forth herein.

71.     The parties' Agreement is a valid and binding contract supported by valuable consideration.

72.     Defendant's actions are in direct violation of the Agreement.

73.     By signing the Agreement, Defendant expressly agreed not to "either solely or jointly with, or as manager or agent for, any person, corporation, trust, joint venture, partnership, or other business entity, directly or indirectly, approach or solicit for business, accept business from, divert business from, or otherwise interfere with

any [Conlan] relationship with, any person or entity (or legal successor to such person or entity) that [Defendant] had any direct contact with while employed by [Conlan] and that: (a) has been a customer of [Conlan] at anytime within the six (6) month period prior to [Defendant's] termination; or (b) to whom [Conlan] had made a proposal within the six (6) month period prior to [Defendant's] termination," for his entire employment and 24 months thereafter.  Ex. 1, § 3.

74.    This non-compete and non-solicitation provision within the Agreement is enforceable because it is reasonably drawn in terms of duration, geographical scope, and line of business and it protects Conlan's legitimate business interests, as evidenced by the fact that it only requires Defendant to refrain from soliciting or accepting business from *actual clients* of Conlan that Defendant had *actually interacted with* in his employment with Conlan.

75.    In violation of the non-compete and non-solicitation provision of the Agreement, Defendant made numerous, intentional contacts with existing Conlan customers in attempts to obtain their business and bring it with him to Snider.

76.    On several occasions, Defendant was successful in doing so and actually pilfered Conlan's clients and business.

77.    But, in any event, each and every of Defendant's contacts with Conlan customers constitutes a breach of this provision, and entitles Conlan to its damages and attorney fees and costs.

78.     As a direct and proximate result of Defendant's violations of the Agreement, Conlan has suffered and will continue to suffer damages in the form of lost business and lost profits and will incur costs and attorney fees in prosecuting this action, which together will exceed $75,000.00.

79.     As a direct and proximate result of Defendant's violations of the Agreement, Conlan is suffering irreparable injury, including the loss of the goodwill of its customers, a weakened ability to fairly compete, and the disclosure of confidential information that Conlan has obtained and/or generated at great expense.

80.     Because certain of Conlan's damages may be unquantifiable and cause irreparable harm, and, in light of Defendant's affirmative and intentional choice to ignore his obligations to Conlan, Conlan is also entitled to an extension of the restrictive covenants within the Agreement, under *Thermatool Corp.*, 227 Mich. App. 366, as well as an injunction restraining Defendant from violating the Agreement.

## COUNT III – BREACH OF COVENANT NOT TO SOLICIT PERSONNEL WITHIN CONFIDENTIALITY AND NON-SOLICITATION AGREEMENT

81.     Conlan restates the allegations in all prior paragraphs as if fully set forth herein.

82.     The parties' Agreement is a valid and binding contract supported by valuable consideration.

83.     Defendant's actions are in direct violation of the Agreement.

84.     By signing the Agreement, Defendant expressly agreed not to "directly or indirectly, solicit for employment, hire, or offer employment to, or otherwise aid or assist any person or entity other than [Conlan], in soliciting for employment, hiring, or offering employment to: (a) any employee of [Conlan] or any independent contractor engaged by [Conlan]; or (b) any former employee or independent contractor of [Conlan] who was employed, or engaged, by [Conlan] within six (6) months before or after the cessation of [Defendant's] employment," for his entire employment and 24 months thereafter.  Ex. 1, § 4.

85.     This non-solicitation of employees provision within the Agreement is enforceable because it is reasonably drawn in terms of duration, geographical scope, and line of business and it protects Conlan's legitimate business interests in retaining its talent in whom it had invested significant money and effort to train, as evidenced by the fact that it only requires Defendant to refrain from soliciting or accepting business from *actual employees* and *former employees* who had been employed within six months of Defendant's termination of employment.

86.     In violation of the non-solicitation of employees provision in the Agreement, Defendant has, on at least two occasions, successfully convinced Conlan employees to leave their employment and join Defendant at Snider.

87.     These employees were Technicians named Jose Vigil and Andy Marmelejo, both specially trained, well compensated for their expertise, and an

important part of sales pitches to obtain and retain customers, creating significant harm to Conlan from Defendant's poaching of these employees.

88.    As a direct and proximate result of Defendant's violations of the Agreement, Conlan has suffered and will continue to suffer damages in the form of lost business and lost profits and will incur costs and attorney fees in prosecuting this action, which together will exceed $75,000.00.

89.    As a direct and proximate result of Defendant's violations of the Agreement, Conlan is suffering irreparable injury, including the loss of the goodwill of its customers, a weakened ability to fairly compete, and the disclosure of confidential information that Conlan has obtained and/or generated at great expense.

90.    Because certain of Conlan's damages may be unquantifiable and cause irreparable harm, and, in light of Defendant's affirmative and intentional choice to ignore his obligations to Conlan, Conlan is also entitled to an extension of the restrictive covenants within the Agreement, under *Thermatool Corp.*, 227 Mich. App. 366, as well as an injunction restraining Defendant from violating the Agreement.

## **Request for Relief**

Conlan requests that this Court:

A.    Award Conlan all damages caused by Defendant's breaches of the Agreement.

B.    Award Conlan its costs and attorney fees, which it is contractually entitled to recover in enforcing the Agreement.  Ex. 1, § 7.F.

C.      Preliminarily and permanently enjoin Defendant from continuing to solicit Conlan's customers and employees until further order of the Court or for a period ending two years from the date such conduct is first enjoined, as the Court deems appropriate under the circumstances.

D.      Preliminarily and permanently enjoin Defendant from using Conlan's confidential information, including its "customer and customer prospects lists" list or its "pricing" information.  Ex. 1, § 2.A.

E.      Award damages in excess of $75,000 to be proven at trial, in an amount sufficient to fully compensate Conlan for all losses suffered as a result of the actions of Defendants described in this Complaint.

F.      Order such other relief, whether legal or equitable, as may be necessary or appropriate to fully protect Conlan's interests and to compensate Conlan for and protect Conlan against the wrongful conduct of Defendant.

Respectfully submitted,

KIENBAUM HARDY VIVIANO
PELTON & FORREST, P.L.C.

By: _/s/ *Ryan D. Bohannon*_____
        Eric J. Pelton (P40635)
        Ryan D. Bohannon (P73394)
        Sean T. H. Dutton (P77515)
Attorneys for Plaintiff
280 N. Old Woodward Ave., Ste. 400
Birmingham, MI 48009
(248) 645-0000
epelton@khvpf.com
rbohannon@khvpf.com
sdutton@khvpf.com

Dated: March 12, 2025

# **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

KIENBAUM HARDY VIVIANO
PELTON & FORREST, P.L.C.

By: */s/ Ryan D. Bohannon*
      Eric J. Pelton (P40635)
      Ryan D. Bohannon (P73394)
      Sean T. H. Dutton (P77515)
Attorneys for Plaintiff
280 N. Old Woodward Ave., Ste. 400
Birmingham, MI 48009
(248) 645-0000
epelton@khvpf.com
rbohannon@khvpf.com
sdutton@khvpf.com

Dated: March 12, 2025

## <u>VERIFICATION</u>

In accordance with 28 U.S.C. § 1746, Greg Williamson declares as follows:

1.      I am Conlan Tire Co., LLC's Chief Operating Officer.

2.      I declare that the factual contents stated in the Verified Complaint against Alec "A.J." Gonzalez are true to the best of my personal knowledge, information, and belief, including on the basis of Conlan's business records complied by persons under my direction.

3.      If called upon as a witness, I could and would testify under oath to the factual contents stated in the Verified Complaint.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 12 day of March, 2025.

Greg Williamson

# EXHIBIT 1

## CONFIDENTIALITY AND NON-SOLICITATION AGREEMENT

This Confidentiality and Non-Solicitation Agreement ("Agreement") is made between Conlan Tire, (and its related entities being referred to collectively hereafter as the "Company") and Alec Gonzales ("Employee"). In consideration of the employment of Employee by the Company, the Company providing Employee with access to Confidential Information, and for other good and valuable consideration, Employee and the Company hereby agree as follows:

1.  **ACKNOWLEDGEMENTS**

    A.    Employee acknowledges that in the development of its business, the Company has expended considerable time, money, and effort in developing and maintaining confidential, proprietary, and trade secret information which, if disclosed or misused, could harm the Company's business and its competitive position.

    B.    Employee acknowledges that Employee will, in the course of, or incident to, his/her employment by the Company, obtain from the Company, as well as from the Company's customers, clients, and accounts, various confidential, proprietary, and trade secret information that would be of considerable value to the Company's competitors.

    C.    Employee acknowledges that Employee will, in the course of, or incident to, his/her employment by the Company, develop personal and professional relationships with the Company's customers, clients, accounts, business associates, and personnel. The relationships which Employee has developed, and will develop in connection with his/her employment with the Company, are irreplaceable and extremely valuable to the Company.

    D.    Employee acknowledges that the Company is entitled to take appropriate steps to ensure that: (i) its employees do not make improper use of confidential, proprietary, and/or trade secret information gained during the course of their employment with the Company; and (ii) no employee or competing entity gains an unfair competitive advantage over the Company.

    E.    Employee acknowledges that the Employee cannot carry out business in the business areas of the Company for himself/herself or on account of a third party without the Company's written consent. This includes but is not limited to other compensable positions, membership on boards of other companies, public offices, and taking part in lectures or publications which affect the Company's interests.

2.  **PRESERVATION OF CONFIDENTIAL INFORMATION**

    A.    Employee agrees that all Confidential Information is, and shall remain, the exclusive property of the Company. As used in this Agreement, "Confidential Information" shall include any and all information that concerns the business affairs of the Company or its customers, clients, or accounts, including but not limited to:  customer and customer prospects lists, call lists and all other customer data; product and service pricing; Company and customer policies and procedures, marketing and business plans and strategies; employee personnel information; independent contractor information; memorandums, notes, records and all other information related to technical data; sketches, plans, drawings, and all other information related to research and development data; accounting processes, formulae, rating, routing and the composition of Company procedures; data programs either printed or on cards including operations manuals, magnetic tape, disc pack, microfilm, microfiche or other storage media containing Company documentation, programs or other information, including but not limited to programs that belong to the Company or are under license to the Company; and logistics in the way of routing, rating and pricing.

    B.    Confidential Information shall not include any information that: (1) is or becomes publicly available through no fault of Employee; (2) was rightfully known by Employee without restriction prior to his/her employment with the Company; (3) is received from a third party who did not acquire or disclose such information by a wrongful or tortious act; or (4) Employee can demonstrate has been independently developed by Employee without reference to any Confidential Information.

Company Initial▆▆▆Employee Initial_____

C.       Employee shall hold all Confidential Information in the strictest confidence, and he/she will not, at any time (i.e., during employment or after the cessation of employment), directly or indirectly, disclose, communicate, or divulge the same to, or use the same for the direct or indirect benefit of, any person or entity other than the Company. Employee further agrees to take all reasonable precautions to protect from loss or disclosure all Confidential Information supplied to him/her by the Company or its customers, clients, or accounts.

D.       Employee shall return to the Company all Confidential Information, as well as all documents, materials, computer software, computer hardware, supplies, calling cards, credit cards, keys, passes, manuals, cell phones, PDAs, and any other property or data that was the property of the Company or was used in the course of Employee's employment with the Company.  The return of such items shall be made immediately upon the Company's request, or at the time of termination, or if that is not possible, as soon thereafter as is possible.

3.  **COVENANT NOT TO SOLICIT CLIENTS, CUSTOMERS, OR ACCOUNTS WITH WHOM EMPLOYEE HAD DIRECT CONTACT**

Employee agrees that, during his/her employment, and for a period of twenty-four (24) months after his/her employment has terminated, for any reason, he/she will not, either solely or jointly with, or as manager or agent for, any person, corporation, trust, joint venture, partnership, or other business entity, directly or indirectly, approach or solicit for business, accept business from, divert business from, or otherwise interfere with any Company relationship with, any person or entity (or legal successor to such person or entity) that Employee had any direct contact with while employed by the Company and that: (a) has been a customer of the Company at anytime within the six (6) month period prior to Employee's termination; or (b) to whom the Company had made a proposal within the six (6) month period prior to Employee's termination.

4.  **COVENANT NOT TO SOLICIT PERSONNEL**

Employee agrees that, during his/her employment, and for a period of twenty-four (24) months after his/her employment has terminated, for any reason, Employee will not, directly or indirectly, solicit for employment, hire, or offer employment to, or otherwise aid or assist any person or entity other than the Company, in soliciting for employment, hiring, or offering employment to: (a) any employee of the Company or any independent contractor engaged by the Company; or (b) any former employee or independent contractor of the Company who was employed, or engaged, by the Company within six (6) months before or after the cessation of Employee's employment.

5.  **EMPLOYEE NOT SUBJECT TO OTHER RESTRICTIONS**

Employee represents and warrants to the Company that there is no agreement, or other reason, why he/she cannot be employed by the Company in the capacity contemplated by the parties.  Without limiting the foregoing, Employee represents and warrants to the Company that Employee's employment with the Company, as contemplated by the parties, will not violate any non-disclosure, non-compete, non-solicitation, or similar restriction or agreement to which Employee is a party or by which Employee is bound.

6.  **COVENANT TO DELIVER COPY OF AGREEMENT TO SUBSEQUENT EMPLOYERS**
Employee agrees to provide a copy of this Agreement to any entity by which he becomes employed or engaged within twenty-four (24) months after his/her employment by the Company has terminated, for any reason.

7.  **REMEDIES FOR BREACH**

A.       Employee expressly recognizes that any breach of this Agreement is likely to result in irreparable injury to the Company, and agrees that the Company shall be entitled, if it so elects, to institute and prosecute proceedings in any court of competent jurisdiction, either in law or in equity, to obtain damages for any breach of this Agreement, to enforce the specific performance by Employee of this Agreement, and/or to enjoin Employee from activities in violation of this Agreement.

Company Initial_____ Employee Initial_____

B.      In the event that the Company seeks to enforce any of the terms of this Agreement, Employee agrees that any legal proceeding may, at the sole discretion of the Company, be instituted in the Macomb County Circuit Court, in Mt. Clemens, Michigan or in the United States District Court for the Eastern District of Michigan, irrespective of the fact that either of the parties now is, or may become, a resident of a different state. Employee irrevocably consents to the jurisdiction of each of these courts and agrees that service of the Complaint or other process may be made as provided in the applicable rules of court.

C.      The validity, interpretation, and performance of this Agreement shall be governed by, and construed in accordance with, the laws of the State of Michigan, without regard to any presumption or rule requiring construction against the party who caused this Agreement to be drafted.

D.      If any portion of this Agreement is held to be unenforceable because of the area covered, its duration, or its scope, Employee agrees that the court making such determination shall have the power to reduce or limit the area, duration, and/or scope, and the restriction shall be enforceable in its reduced form.

E.      In the event that the restrictions in Sections 3 or 4 of this Agreement are not fully complied with by Employee, it is agreed that the period of the restriction(s) shall be extended to commence with the full compliance by Employee, and to run fully thereafter, reduced only by the length of time between the cessation of Employee's employment and his/her first violation of Section 3 or 4.

F.      The parties agree that the prevailing party in an action to enforce this Agreement shall be entitled to reimbursement for its costs and reasonable attorney's fees.

8.   **SUCCESSORS, PURCHASERS, AND ASSIGNS**

This Agreement may be assigned by the Company, in its sole discretion, to successors, purchasers, and/or assigns.

9.   **ENTIRE AGREEMENT**

This Agreement constitutes the complete understanding between the parties with respect to the subject matter hereof, and cannot be changed or modified except by written agreement signed by Employee and an authorized representative of the Company.

10.  **EMPLOYEE CERTIFICATION**

By signing below, Employee certifies that:  (a) he/she has received a copy of this Agreement to review prior to signing; (b) he/she has read this Agreement carefully before signing it; (c) he/she has had ample opportunity to ask questions concerning this Agreement, including the opportunity to discuss this Agreement with legal counsel of his/her own choosing; (d) in the event his/her employment with the Company ceases, for any reason, he/she will be able to earn a livelihood without violating any of the restrictions contained in this Agreement; and (e) he/she understands his/her rights and obligations under this Agreement and enters into this Agreement voluntarily, and with the intention to be legally bound thereby.

EMPLOYEE                                            On Behalf of Conlan Tire,

Alec Gonzales                                       ██████████████ – H.R. Manager
Employee (Print Name)                               HR-1 Corp.

Employee Signature                                  By Company Signature

Date:      07/13/2022                               Date:  7/12/22

PHILADELPHIA\3283177\1 053718.000 080207