UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CONLAN TIRE CO., LLC,

Plaintiff,

v.

ALEC GONZALES,

Defendant.

Case No. 25-10701
Honorable Shalina D. Kumar
Magistrate Judge Anthony P. Patti

**OPINION AND ORDER GRANTING IN PART PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION**

## I.      Introduction

Plaintiff Conlan Tire Co., LLC ("Conlan"), sues defendant Alec

Gonzales ("Gonzales") alleging Gonzales breached the Confidentiality and

Non-Solicitation Agreement he executed with Conlan when he worked for

them as a sales representative. ECF No. 1. Conlan moved for a temporary

restraining order and preliminary injunction seeking to enjoin Gonzales

from soliciting Conlan's customers for business or accepting business from

them, diverting business from Conlan, persuading employees of Conlan to

leave, and using Conlan's confidential information. ECF Nos. 5, 9. The

parties stipulated to a preliminary injunction, which the Court extended until

Conlan's motion for sanctions was fully resolved. *See* ECF Nos. 21, 30, 38. The Court has partially granted that motion (ECF No. 48) and, for the following reasons, grants in part Conlan's motion for preliminary injunction.

## II.    Factual Background

Conlan is a commercial tire business that provides tire sales, tire retreading, and tire repairs for commercial trucks across the United States. ECF No. 1, PageID.2-3, ¶ 5. In July 2022, Conlan hired Gonzales as an account executive for the Dallas/Fort Worth area. *Id*. at PageID.5, ¶ 13. As stated in the complaint, account executives are tasked with developing and maintaining relationships with customers and are provided with an expense account to facilitate such relationships. *Id*. at PageID.4, ¶ ¶ 10, 11. Due to the nature of his employment with Conlan, Gonzales had access to Conlan's sensitive information including "information regarding the particular needs of Conlan's customers, each customer's unique preferences, customer purchasing history, the terms of customers' business relationships with Conlan, pricing strategies, marketing plans and strategies, the identity of and plans for specifically targeted prospective customers, and certain non-public financial records." *Id*. at PageID.5, ¶ 15.

He was also privy to confidential customer lists, pricing information, and business plans. *Id.*, ¶ 16.

To protect this type of proprietary information, Conlan requires all account executives to sign a Confidentiality and Non-Solicitation Agreement ("the Agreement"). *Id.*, at PageID.6, ¶ 18; ECF No. 5-5, PageID.109, ¶ 4; ECF No. 5-6, PageID.120, ¶ 4; ECF No. 19-1, PageID.234-36, ¶ ¶ 4, 5; ECF No. 46-6, PageID.1139, ¶ 9. The Agreement requires signatories, in pertinent part, to: (1) keep all of Conlan's nonpublic, proprietary information confidential; (2) not solicit or accept business from Conlan's clients with which they had direct relationships for 24 months after they leave Conlan's employ; and (3) not solicit any personnel during their employment and for 24 months after leaving. *See* ECF No. 5-3, PageID.77-78.  According to Conlan, Gonzales signed the Agreement on July 13, 2022, five days before starting his employment with Conlan. *Id.* at PageID.79; *see* ECF No. 19-1, PageID.236.

On December 30, 2024, Gonzales was terminated from his position after he crashed his company vehicle, allegedly while driving under the influence. ECF No. 1, PageID.9, ¶ 31. Shortly after his termination, Gonzales accepted a sales position with Snider Fleet Solutions ("Snider"),

who is a direct competitor of Conlan, and began breaching the terms of the Agreement with Conlan. *Id.* at PageID.10, ¶ ¶ 33, 34. Other Conlan account executives attested under penalty of perjury that Gonzales has solicited more than a dozen of Conlan's customers with whom he had prior relationships. ECF No. 5-5, PageID.110-13, ¶ ¶ 6-8; ECF No. 5-6, PageID.120-22, ¶ ¶ 5-7. In addition to poaching customers, Gonzales also allegedly convinced several Conlan employees to join Snider. ECF No. 5-5, PageID.113, ¶ 10.

Conlan claims Gonzales' actions have caused irreparable harm to its business and seeks a preliminary injunction to enjoin him from conduct prohibited by the Agreement—communicating with customers of Conlan, soliciting its employees, and using its confidential information in furtherance of his work with a competitor.

Gonzales advances only one defense to Colan's claim he breached the Agreement: that he never signed it. *See* ECF Nos. 5-3, 18-1, 22. Although Conlan has a copy of the Agreement with his purported signature, Gonzales disputes the authenticity of that signature, initially swearing that "he did not recall" signing the Agreement, ECF No. 18-1, PageID.219, ¶ 4, and later declaring under oath that he "never agreed to nor personally

signed" the Agreement. ECF No. 28, PageID.355, ¶ 2. Gonzales alleges that someone else added an image of his signature on the Agreement. *Id*. at PageID.356, ¶ 4.

To support this claim, Gonzales asserts that the signature on the Agreement appears to be an exact replica of two other signatures from Conlan's Offer Letter and Addendum 1A, which he likewise disputes signing. *Id*., ¶ 5. He attests that he physically signed all other onboarding documents contained in his personnel file in person at Conlin's Grand Prairie, Texas office, and those signatures do not match those on the three other documents, including the Agreement. *Id*., ¶ 7. Notably, he declares under the penalty of perjury that he had no means to apply an electronic signature in July 2022, on either his MacBook laptop, which he still has, or on his July 2022 cell phone "which [he] still possess[es] and use[s] today."[1] *Id*. at ¶ 6.

---

[1] Notwithstanding this declaration, neither the laptop nor the cellphone Gonzales currently uses are the ones he used in 2022. Gonzales later acknowledged that he traded in the iPhone he used in 2022, and the company conducting digital forensic examination on Gonzales' devices recently revealed that the laptop produced by Gonzales for analysis was manufactured in 2024. ECF No. 46-2, PageID.997; ECF No. 47, PageID.1188.

As detailed in this Court's orders relating to Conlan's motion for spoliation sanctions, based on Gonzales' claims that he never signed the Agreement and thus never emailed it to Conlan, the parties engaged in limited discovery regarding Gonzales' electronically stored information ("ESI").[2] *See* ECF No. 30, 38, 48. During the forensic examination of Gonzales' devices, the digital forensic examiners discovered that Gonzales had used ChatGPT to research how and when deleted emails could be retrieved and produced by Yahoo under a subpoena. *See* ECF No. 32-2. ChatGPT provided the following responses to Gonzales' pointed queries: Yahoo could not retrieve an email deleted from his account a year ago, even under a subpoena; an email permanently deleted[3] today would be retrievable by Yahoo for at most seven days, and Yahoo does not maintain individual deletion histories nor does it track deleted emails in an audit log. *Id*. Gonzales provided the forensic examiner access to his Yahoo account

---

[2] Conlan has limited storage for email accounts and no longer has any emails from 2022. ECF No. 46-5, PageID.1108-09; ECF No. 19-1, PageID.237, ¶ 5(e).

[3] Permanent deletion is the deletion of the email from the user's inbox, and the further deletion of it from the trash folder (where emails deleted from the inbox are stored for roughly 30 days if not deleted from the trash folder sooner). *See* ECF No. 38.

28 days after he conducted his ChatGPT research on deleted Yahoo emails. ECF No. 36-4.

The Court rejected Gonzales' "contrived, implausible, and deceptive arguments" that his ChatGPT queries were not indicative of his intent to delete emails and granted Conlan's motion for spoliation sanctions, awarding Conlan its costs and fees incurred in litigating the existence of Gonzales' emails, and, relevant to this motion, imposing an adverse inference against Gonzales regarding the content of the deleted emails. ECF Nos. 38, 48.

## III.    Analysis

The Court uses four factors when evaluating a motion for a preliminary injunction: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction. *Stryker Empl. Co., LLC v. Abbas*, 60 F.4th 372, 385 (6th Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal."

*Id*. (quoting *O'Toole v. O'Connor*, 802 F.3d 783, 788 (6th Cir. 2015)) (internal marks omitted).

### A.      Likelihood of Success on the Merits

In diversity cases, courts apply state law to determine whether the plaintiff has demonstrated a substantial likelihood of success on the merits of their action. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp*, 511 F.3d 535, 541 (6th Cir. 2007) (citations omitted). In this case, the parties do not contest that the Agreement calls for Michigan law to govern any dispute arising under it. *See* ECF No. 5-3, PageID.79. Michigan courts have found two-year non-solicitation covenants reasonable because "employers have legitimate business interests in restricting former employees from soliciting their customers." *Total Quality, Inc. v. Fewless*, 958 N.W.2d 294, 306 (Mich. Ct. App. 2020) (finding time-limited restrictive covenant which prohibited solicitation of the former employer's customers and employees but did not prohibit general competition with the former employer, was reasonable).

A likelihood of success on the merits may be shown "if the plaintiff has raised questions going to the merits" that are "serious, substantial,

difficult and doubtful" enough "to make them fair ground for litigation." *Certified Restoration,* 511 F.3d at 543 (internal quotations omitted).

As noted, Gonzales' sole defense to Conlan's claim is that he did not sign the Agreement. Gonzales' defense is supported by his own declarations, made under the penalty of perjury. *See* ECF No. 18-1; ECF No. 28; ECF No. 35-2. Initially, Gonzales declared that he did not recall signing the Agreement and did not believe he agreed to be bound by it. ECF No. 18, PageID.219, ¶ 4. Later he declared, more emphatically, that he had reviewed the Agreement and made the deliberate decision not to sign or return the Agreement to Conlan. ECF No. 28, PageID.356, ¶ 5. He also attested that he does not believe the signature on the Agreement to be his because it does not look like the signatures on his other Conlan onboarding documents, all of which he physically signed. He also declared that he lacked the capability to electronically sign documents in 2022. *Id*. at PageID.355-57, ¶ ¶ 4-8. In yet a third declaration, he attested that he signed all onboarding documents in person at Conlan's Grand Prairie, Texas office. ECF No. 35-2, PageID.732, ¶ 6.

Contrary to Gonzales' evolving declarations, Conlan offers declarations and deposition testimony from other account executives, as

well as HR personnel, supporting its assertion that all Conlan account executives must sign the Agreement (and that non-compete agreements are standard in the commercial tire industry), and that, in fact, Gonzales would not have progressed to receiving a start date and the rest of his onboarding forms if he had not returned the signed Agreement via email. ECF No. 5-5, PageID.109, ¶ 4; ECF No. 5-6, PageID.119-20, ¶ ¶ 2, 4; ECF No. 19-1, PageID.234-38, ¶ ¶ 4-5; ECF No. 35-3, PageID.739; ECF No. 36-2, PageID.758, ¶ 4; ECF No. 46-6, PageID.1136, ¶ ¶ 3-4. Both Christopher Kenrick ("Kenrick"), the HR manager for Conlan, and Katy Chess ("Chess"), an HR coordinator for Conlan[4] at the time of Gonzales' hiring, testified that the pre-employment forms, including the Agreement, were emailed directly to the candidate if the candidate was not in the state of Michigan. ECF No. 19-1, PageID.235, ¶ 4; ECF No. 36-2, PageID.756-58, ¶ ¶ 2-4; ECF No. 46-6, PageID.1136, ¶ 3. Moreover, Chess attested in her declaration that the onboarding documents she transmits to a new employee's physical work location for completion never include the Agreement because the executed Agreement has been returned to the HR manager before she is

---

[4] Both Kenrick and Chess work for HR1, an affiliated company providing human resources services for Conlan and other affiliated companies. *See* ECF No. 35-3 PageID.737; ECF No. 46-5, PageID.1107.

involved and tasked with generating and sending those new hire documents to the physical location of the employment. ECF No. 46-6, PageID.1137, ¶ 5.

Additionally, several of Gonzales' declarations have been established to be false. Specifically, Gonzales declared under penalty of perjury in June 2025 that he had the same Apple MacBook and cell phone that he used in July 2022. ECF No. 28, PageID.356, ¶ 6. But in August 2025, Gonzales acknowledged that he had been "reminded" that he had traded in and no longer possessed the cell phone he used in 2022. ECF No. 42-1, PageID.959, ¶ 3. And, as the forensic digital examiner revealed in its September 2025 report, the MacBook Gonzales produced for examination (for data from 2022) was not manufactured or sold by Apple until 2024, and thus clearly was not the laptop he used in 2022. ECF No. 46-2, PageID.997, § 6.

Finally, because of spoliation sanctions against Gonzales, *see* ECF No. 48, the Court and any jury will presume the pre-employment emails between Gonzales and Conlan are unfavorable to Gonzales, i.e., the missing emails would show that Conlan had sent the Agreement to Gonzales and that he had returned it, signed, to Conlan via email.

In sum, there is much evidence that Gonzales signed the Agreement. Accordingly, the Court finds that Conlan has a strong likelihood of success on the merits of its breach of Agreement claim against Gonzales and this factor favors granting a preliminary injunction.

**B.    Irreparable Harm**

In addition to establishing a likelihood of success on the merits, plaintiffs seeking injunctive relief must demonstrate that they are likely to suffer irreparable harm in the absence of preliminary injunctive relief, that an injunction will not result in substantial harm to others, and that an injunction is in the public interest. *James B. Oswald Co. v. Neate*, 98 F.4th 666, 672 (6th Cir. 2024). "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet v. Lexington–Fayette Urb. Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002).

"[A]n injury is not fully compensable by money damages if the nature of the plaintiff's loss would make the damages difficult to calculate." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992). "[I]nterference with customer relationships resulting from the breach of a non-compete agreement is the kind of injury for which monetary damages

are difficult to calculate." *Certified Restoration*, 511 F.3d at 550. The loss of fair competition resulting from the breach of a non-compete covenant is likely to irreparably harm an employer. *Id*.; *Basicomputer Corp.*, 973 F.2d at 512. The loss of customer goodwill is also irreparable. *Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 530 (6th Cir. 2017).

The Court agrees with Conlan that it will suffer irreparable harm if a preliminary injunction is not issued. As discussed above, Conlan has demonstrated a likelihood of success on the merits for its claim for breach of the Agreement. Without an injunction, Gonzales would be free to continue to solicit Conlan's customers and employees and exploit the goodwill he established or strengthened with its customers during his employment in order to compete with Conlan. Consequently, Conlan would suffer irreparable harm because any damages from the loss of goodwill and poached employees from Gonzales' breach of the Agreement would be difficult to calculate.

Additionally, the Agreement states that: "[Gonzales] recognizes that any breach of this Agreement is likely to result in irreparable injury to [Conlan], and agrees that [Conlan] shall be entitled…to enjoin [Gonzales] from activities in violation of this Agreement." ECF No. 5-3, PageID.78, ¶

7.A. Thus, Gonzales explicitly agreed that any breach of the Agreement would constitute irreparable harm for purposes of an injunction. Although such a contractual provision is not dispositive or sufficient evidence by itself, it is appropriate evidence for the Court to consider when making an irreparable harm determination. *See York Risk Servs. Grp., Inc. v. Couture*, 787 F. App'x 301, 308 (6th Cir. 2019) (providing that a district court may consider a contractual stipulation of irreparable harm as a "piece of evidence in support of a finding of irreparable harm"); *Mktg. Displays Int'l v. Shaw*, 646 F. Supp. 3d 897, 907 (E.D. Mich. 2022) (considering a contractual provision acknowledging a breach would cause irreparable harm as evidence of irreparable harm).

For these reasons, the Court finds that Conlan would suffer irreparable harm if the terms of the Agreement are not enforced and that this factor too supports issuing a preliminary injunction.

## C.    Other Factors

Conlan asserts, and Gonzales does not contest, that injunctive relief would not cause substantial harm to Gonzales and that public interest favors an injunction in breach of non-compete cases such as this one. The Court agrees that entering a preliminary injunction here imposes no

substantial harm to Gonzales because it merely imposes the same restrictions on him as required by the Agreement. Further, the terms of the injunction (and the Agreement) permit Gonzales to continue to work for Snider without soliciting or servicing Conlan customers, as he has been since stipulating to the preliminary injunction earlier in this litigation. *See* ECF Nos. 21, 30, 38*.; see also Certified Restoration*, 511 F.3d at 550-51.

Likewise, enforcement of contractual duties is in the public interest. *Id*. at 551. Issuing the preliminary injunction would simply enforce the terms of the Agreement. *Id*. Accordingly, the Court finds that these final factors also support the issuance of the preliminary injunction.

## IV.   Conclusion

For the reasons above, the Court **GRANTS** Conlan's motion for preliminary injunction. It is **ORDERED** that Gonzales is enjoined from, directly or indirectly, the following conduct:

- Servicing any Conlan customer that he serviced while employed by Conlan, soliciting business from Conlan customers, accepting business from Conlan customers, diverting business from Conlan, aiding any employee or agent of Snider or any other commercial tire provider with doing any

of the above, initiating contact with any Conlan customer for any commercial or business purposes, or referring any of them to any specific company.

- If Gonzales is contacted by any Conlan customer for business purposes during the time this preliminary injunction is in force, Gonzales shall say only that "he is no longer employed by Conlan;" and, if the Conlan customer was also a Snider customer before the date Gonzales began employment with Snider, Gonzales shall say that the Snider customer is "welcome to contact someone else at Snider, but that he cannot service their business at this time."

- Soliciting, initiating contact, or communicating with any Conlan employee for the purpose of persuading the employee to leave Conlan's employ.

- Using, disclosing, or transmitting Conlan's confidential information in furtherance of his work with Snider, or any other commercial tire provider.

**IT IS FURTHER ORDERED** that any request for attorneys' fees and costs in pursuing this injunction or the entry of this Order is **DENIED**.

Page **16** of **17**

**IT IS FURTHER ORDERED** that this Order expires on **April 29, 2027**, unless otherwise ordered by this Court.

**IT IS SO ORDERED.**

s/ Shalina D. Kumar
SHALINA D. KUMAR
United States District Judge

Dated: March 10, 2026